(35 App. Div. 300.)

### PEOPLE ex rel. WHITE v. YORK et al.

(Supreme Court, Appellate Division, Second Department. December 6, 1898.)

MUNICIPAL CORPORATIONS—POLICEMEN—GRADING—CONSTITUTIONAL LAW.
    Laws 1898, c. 398, § 1, providing that New York policemen who were formerly members of the force of New Utrecht, which had been consolidated with Brooklyn prior to its consolidation with New York, should be graded in the same rank as they held on the New Utrecht force, is repugnant to Const. art. 10, § 2, providing that all city officers not acquiring office under the constitution shall be elected, or appointed by city authorities designated by the legislature.

Appeal from special term, Kings county.

Application by the people, on the relation of Martin H. White, for a writ of mandamus against Bernard J. York and others, as police commissioners, etc. From an order denying relator's motion, he appeals. Affirmed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.

James C. Church, for appellant.
William J. Carr, for respondents.

HATCH, J. Prior to July 1, 1894, the relator was a captain of police in the Western division of the town of New Utrecht. Upon that day, by virtue of the provisions of chapter 451 of the Laws of 1894, the territory embraced in said town became annexed to, and was made a part of, the city of Brooklyn, in the county of Kings, and the said town thereafter ceased to have any existence as a political division of the state. Civil administration over said territory was vested in the officers of the city of Brooklyn. By section 14 of the act the territory of the town was constituted a police precinct of the city of Brooklyn, and the commissioner of the department of police of such city was authorized to appoint not to exceed 24 additional patrolmen and officers for said territory. The men and officers then upon the police force of said town, if found competent, were given "preference in appointment as patrolmen upon such force." The obligation of a civil service examination was not imposed upon the incumbents, but the commissioner of the department of the city was authorized to examine and determine as to their competency, and, as he found them competent, in his discretion to appoint them "upon the police force of

said city," and they were "graded and paid as other patrolmen in said department." In pursuance of this authority the commissioner decided that the relator was a competent person to be appointed a policeman of the city of Brooklyn, and he was so appointed, graded, and paid as a patrolman of such city, and thereafter acted as such patrolman. The exact date when the relator was appointed as a patrolman of the city is not stated in the record, but it is evident that it followed immediately upon the act becoming of force. At least, it appears that he was so in office prior to the adoption of "the Greater New York charter."

It is clear from the provisions of the act of 1894 that the town of New Utrecht was merged in the city of Brooklyn, all of its functions as a town ceased, and its offices were abolished, except as the same were kept alive for the performance and completion of certain acts, not pertinent to any present question. The police force of the town was abolished, and thereafter had no existence as such. By virtue of the provisions of chapter 378, Laws 1897, the city of Brooklyn was annexed to, and became a part of, the territory of Greater New York. The effect of this act, as we have heretofore held, and in which the relator concurs, was to make the police force of the city of Brooklyn a part of the police force of the consolidated city; ranking in the respective offices and positions held by its members, as nearly as the same might be, under the provisions of the act of consolidation. The relator was found in the position of a patrolman at the time when the latter act took effect, and as such he was transferred to the service of the consolidated city, and has ever since been, and now is, performing duty as a patrolman of such city.

In 1898 the legislature passed chapter 398 of the Laws of that year. The title reads:

"An act to grade the members of the police force of the city of New York who were members of the New Utrecht police force before New Utrecht was annexed to the city of Brooklyn."

Section 1 provides:

"The members of the police force of the city of New York who were officers of the New Utrecht police force before New Utrecht was annexed to the city of Brooklyn, are hereby graded in the same rank as they held on the New Utrecht force, and their pay shall be the same as paid to officers of corresponding rank on the said police force of the said city of New York. They shall also receive the same rights and privileges as all other members of the police force of the said city."

This act was accepted by the city, and by its terms took effect immediately. The purpose to be accomplished by its provisions is plain, and scarcely needs construction. Its effect is to fix the status of the relator as it existed upon the police force of New Utrecht, and then grade him upon the present force of the city of New York in accordance with that status. This, in effect, names the relator as an officer upon the police force of the town, and then appoints him to office in the city of New York. It could not effect this purpose with more directness if it had named the relator in person, and commanded that he should be appointed to the particular position in the present police department. The act goes so far as to say—if not in terms, at least

in effect—that, if it should appear that he had attained a higher grade in the present force of New York, he should be reduced to an equivalent grade corresponding to that which he held in the town of New Utrecht. The preamble of the act contemplates grading the present members of the police force of New York who were formerly members of the police force of the town; and the terms of the act provide that they "are hereby graded in the same rank as they held on the New Utrecht force." This, perhaps, was not intended to effect such result, and does not do so, so far as the relator is concerned, but its possibilities assert with much clearness that its effect is to appoint certain persons to office. Its effect extends even beyond what we have asserted. If it be upheld as a valid exercise of legislative power, it brings the dead to life. The town of New Utrecht had passed away. It had no more existence as a political division of the state than the Roman empire, as an existing political power. Its police force, as an entity, was as dead as Rameses the Second. Its membership was scattered, and so far as its personnel was concerned, as applied to this relator, it existed in an entirely different place, in a new grade and form of service, and under a new master, all of which conditions had been voluntarily accepted and acted upon by the relator. The question, therefore, which confronts us, is, can the legislature, under the constitution, revive this body of police, or any of its members, as a constituent element of such body, and, being revived, appoint one or all to office? For such, as we construe it, is its legal effect. By section 2 of article 10 of the constitution it is, among other things, provided:

"All city, town and village officers, whose election or appointment is not provided for by this constitution, shall be elected by the electors of such cities, towns and villages, or of some division thereof, or appointed by such authorities thereof, as the legislature shall designate for that purpose."

Captains of police and patrolmen were in existence, under the control of municipal authority, and pursuing functions similar to the present force, at the time of the adoption of the present constitution, and also similarly in existence under prior constitutions. The court is authorized so to assume, and take notice of such fact. People v. Raymond, 37 N. Y. 428. Appointments to positions upon and offices in the police force of a municipality have always been made, so far as we have information, by local authority, acting under legislative direction, in pursuance of this or similar provisions of other constitutions. If the office of a police captain be a city office, then, under the constitution, it can be filled in no other way. That such an officer is a city officer, we do not doubt. While it is undoubtedly true that a police force is charged with the performance of a public service, in which the corporation, as such, has no special interest, and derives no other benefit than such as is common to the public at large, yet it is also true that the corporation in other respects also derives a benefit from such source peculiar to itself. People v. Andrews, 104 N. Y. 570, 12 N. E. 274. The corporation may not be liable for the torts or negligence of its police officers, yet this is not the test. In part, such officers occupy a dual position,—one in which they represent the public, and the other in which they represent the corporation. It is not always easy to determine into which class the officer falls. While as to many

of the requirements a police captain answers the rule which exempts from liability and makes of such person a state official, yet in other respects it wholly fails. The corporation has the immediate control and immediate power of removal of these officers, so far as removal is now permitted by general or special laws, and also of their subordinates and servants; and, while the corporation is exempted from liability so far as the performance of duty by the officer represents a function of general government imposed by law, yet by reason of the officer's relation to the corporation, and its powers over him, he is considered, notwithstanding the general character of his duties, as an officer of the city, within the meaning of this article of the constitution. When the duties of such officers are regulated by statute, for their nonfeasance or misfeasance in the performance of such duty the municipality is not liable, and this for the reason that the doctrine of respondeat superior does not apply. Lorillard v. Town of Monroe, 11 N. Y. 392. When they act as agents of the municipality, liability attaches. Maxmilian v. Mayor, etc., 62 N. Y. 160. But, even though they do not represent the municipality in the performance of a given act, they nevertheless act in a circumscribed locality, and do not cease to be, but remain, officers of the city. People v. Board of Canvassers, 129 N. Y. 360–368, 29 N. E. 345. The dual character of positions where the general governmental function and the corporate interest combine appears in People v. Raymond, supra, where the commissioner of taxes was held to be a local officer, although he apportioned the taxes due the state, within this provision of the constitution. People v. Crooks, 53 N. Y. 648. The same rule has also been applied to police officers, in terms (People v. Draper, 15 N. Y. 532–540; People v. Albertson, 55 N. Y. 50), and the same principle applied in other cases (People v. McKinney, 52 N. Y. 374). Under the civil service statutes, offices of a similar character are held to be local offices. People v. Wright, 150 N. Y. 444, 44 N. E. 1036; People v. Tobey, 153 N. Y. 381, 47 N. E. 800. It is therefore evident that this act cannot be supported under this provision of the constitution, as its clear effect is to create an office not existing at the time of its passage, and providing that the relator shall occupy the same. This act is entirely different from the legislative power which was invoked, accomplishing the consolidation of the territory going to make up the Greater New York. That act, so far as these and other similar offices are concerned, found such offices in the territory upon which it operated. The act did not change their status. It sought to preserve it in the positions in which it found them, and it left with the people and in local administrative authority power to elect and appoint the officers of the city government in its various departments, pursuant to the provisions of the constitution. The difference between that act and the one under consideration is apparent. The former seeks to consolidate certain civil divisions of the state, and preserve, so far as possible, the executive and governmental functions therein existing, and make further provision for government in the newly-created municipality. The latter resurrects a defunct organization, and commands that certain of its members be given a specific office. This is beyond the legislative power, as applied to these positions. The act which annexed the

town of Flatlands to the city of Brooklyn (chapter 450, Laws 1894) preserved the police force of that town, and made special provision as to its status. Such act, like the act which consolidated the territory which now goes to make up the Greater New York, simply recognized the machinery of government as it existed in the annexed territory, and sought to preserve it in order that governmental functions might not cease. These acts did not appoint men to office. They continued an existing order, and made provision for a continuance of government. They are the exercise of entirely different power from that attempted under the present act, and do not affect the present question. Had the act which annexed the town of New Utrecht to the city of Brooklyn preserved its police department, as did the other acts, we should have the question presented by such legislation, but it did not. On the contrary, that act abolished such force as a force, and made provision for their becoming patrolmen. It is now beyond the power of the legislature to revive the force and appoint its members to office. We are not to be understood as deciding that it is beyond the legislative power to enact laws for the general government of a police force, and in so doing to provide for grading and promoting persons in such force; and this even though its effect might be to designate, in an isolated case, a particular person, provided it appeared that the operation of the law was general in its character.

It follows that the order should be affirmed.

Order affirmed, with $10 costs and disbursements. All concur.